# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

NATHAN WILSON,

        Defendant.

)
)
)
)
)
)
)
)
)
)

Case No. CR 20-0516 FMO

**ORDER RE: PENDING MOTION**

Having reviewed and considered all the briefing filed with respect to defendant Nathan Wilson's ("Wilson") Motion to Dismiss or in the Alternative Compel Discovery (Dkt. 130, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## BACKGROUND

In the summer of 2020, following the May 25, 2020, death of George Floyd at the hands of police, widespread protests against racial injustice broke out across the country. (See Irene Oritseweyinmi Joe, "Probable Cause and Performing 'For The People,'" 70 Duke L. J. Online 138, 140-41 (May 2021)). One such protest unfolded in the Los Angeles metropolitan area, specifically Santa Monica, on May 31, 2020. Former United States Attorney General William Barr ("Barr") and former President Donald Trump ("Trump") made several public statements and issued various directives about the protests – including those in Los Angeles – and how the United States Department of Justice ("DOJ") intended to address criminal activity that occurred during the protests. For example, on May 30, 2020, Barr said in a "Statement on the Death of George Floyd and Riots[,]" that the "protests [had been] hijacked by violent radical elements" and "[g]roups of

outside radicals and agitators are exploiting the situation to pursue their own separate and violent agenda.  In many places, it appears the violence is planned, organized, and driven by anarchistic and far left extremists, using Antifa-like tactics[.]"  (DOJ, "Attorney General William P. Barr's Statement on the Death of George Floyd and Riots" (May 30, 2020), https://bit.ly/Barrstatement).[1] Barr also stated that the "Department of Justice . . . and all of [its] 93 U.S. Attorneys across the country, will support these local efforts and take all action necessary to enforce federal law."  (Id.).

The next day, the day of the protest at issue in this case, Barr issued a "Statement on Riots and Domestic Terrorism," stating that "[f]ederal law enforcement actions will be directed at apprehending and charging the violent radical agitators who have hijacked peaceful protest and are engaged in violations of federal law. . . .  The violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly."  (DOJ, "Attorney General William P. Barr's Statement on Riots and Domestic Terrorism" (May 31, 2020), https://bit.ly/Barr-on-terrorism).

In a Rose Garden speech on June 1, 2020, former President Trump said that "our nation has been gripped by professional anarchists, violent mobs, arsonists, looters, criminals, rioters, Antifa, and others. . . .  I want the organizers of this terror to be on notice that you will face severe criminal penalties and lengthy sentences in jail.  This includes Antifa and others who are leading instigators of this violence."  ("Trump to Mobilize Federal Resources to Stop Violence, Restore Security," ABC News (June 1, 2020), https://bit.ly/Trump-Mobilizes).

The same day as the Rose Garden address, Trump and Barr held a conference call with state governors in which Barr stated that in "most places, you have this ingredient of extremist

---

[1] The government does not raise any evidentiary objections to the public statements quoted in news articles and on government websites that defendant relies upon.  (See, generally, Dkt. 148, Government's Opposition to Defendants' Motion to Dismiss and Motion to Compel Discovery ("Opp.")); see Dutta v. State Farm Mut. Auto. Ins. Co., 895 F.3d 1166, 1172 (9th Cir. 2018) ("If a party does not object to or challenge the improper submission of new evidence before the district court, the party who fails to object has waived any challenge on the admissibility of the evidence.") (cleaned up); United States v. Tuitt, 68 F.Supp.2d 4, 7 (D. Mass. 1999) ("Because the substance of th[e] evidence [in support of defendant's motion for discovery] is not challenged by the Government, although its import is, the court accepts the [] proffered evidence as accurate.").

anarchist agitators[,]" and that federal law enforcement would "go after the guys that are throwing the bricks and (inaudible) . . . running around starting fires." ("President Trump's Call with US Governors Over Protests," CNN (June 1, 2020), https://bit.ly/Trump-call). During the call, Trump said that the federal government "will activate Bill Barr and activate him very strongly." (Id.). He also referenced the May 31, 2020, Los Angeles protests, stating that "[o]f all the places, what went on . . . in Los Angeles with the stores and the . . . is terrible. Total domination, you have to dominate. . . . You've got to arrest these people and you've got to judge them, and you can't do the deal where they get one week in jail. These are terrorists[,] . . . they're looking to do bad things to our country. They're Antifa and they're radical left." (Id.).

On June 26, 2020, nearly a month after the protest that is the subject of this case, Barr issued a memorandum to all the United States Attorneys entitled, "Department of Justice Task Force on Violent Anti-Government Extremists." (See DOJ, "Memorandum Regarding Department of Justice Task Force on Violent Anti-Government Extremists" (June 26, 2020), https://bit.ly/Memo-task-force ("Task Force Memorandum")). The Task Force Memorandum states that the federal government had "evidence that anti-government violent extremists . . . will pose continuing threats of lawlessness[,]" so Barr decided to create a "task force devoted to countering violent anti-government extremists[,]" which would provide resources to help prosecute "violent acts of anti-government extremists." (Id. at 1-2).

In a television appearance on August 9, 2020, Barr said that Antifa is "a revolutionary group that is interested in some form of socialism communism. . . . They're essentially Bolsheviks, their tactics are Fascist." ("Bill Barr: Antifa is 'New Form of Urban Guerrilla Warfare,'" Fox News (Aug. 9, 2020), https://bit.ly/Barr-on-Antifa). According to Barr, "[i]t's a new form of urban guerrilla warfare. . . . [W]hat they do is, they are essentially shielding themselves, or shrouding themselves in First Amendment activity. . . . [T]hey hijack these demonstrations and they provoke violence[.]" (Id.).

In September, 2020, Barr held a conference call with the United States Attorneys from across the country where he directed them to "be aggressive when charging violent demonstrators with crimes" and "encouraged the prosecutors to seek a number [of] federal charges . . . even

when state charges could apply[.]" (Aruna Viswanatha & Sadie Gurman, "Barr Tells Prosecutors to Consider Charging Violent Protesters With Sedition," The Wall Street Journal (Sept. 17, 2020)).

On October 23, 2020, a federal grand jury returned a single-count indictment against defendants charging them with malicious damage to property owned by an institution or organization receiving federal financial assistance, in violation of 18 U.S.C. §§ 844(f)(1) and (2). (See Dkt. 11, Indictment). The Indictment alleges that, on or about May 31, 2020, defendants destroyed a vehicle belonging to the Santa Monica Police Department by lighting it on fire. (See id.).

On May 14, 2021, Wilson propounded discovery requests seeking, among other things, information about cases the United States Attorney's Office for the Central District of California ("USAO") has brought charging violations of 18 U.S.C. §§ 844(f) and (i); the criteria used to decide whether to file such charges; communications about the decision to prosecute Wilson; and communications about the decision to prosecute cases arising out of the George Floyd protests. (See Dkt. 130, Motion at 19). The government responded on June 25, 2021, stating that it would not provide the requested discovery. (See Dkt. 130, Motion at 19).

Wilson filed the instant Motion, in which co-defendant Christopher Beasley ("Beasley") joined, arguing that (1) the Indictment should be dismissed because the government engaged in selective prosecution or, (2) in the alternative, the government should be compelled to produce discovery relevant to defendants' selective prosecution claim. (See Dkt. 130, Motion at 11-22).

**LEGAL STANDARD**

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." United States v. Armstrong, 517 U.S. 456, 463, 116 S. Ct. 1480, 1486 (1996) ("Armstrong"). "[A]n indictment that results from selective prosecution will be dismissed." United States v. Mayer, 503 F.3d 740, 747 (9th Cir. 2007). While "[m]ere selectivity in prosecution creates no constitutional problem[,]" the "Due Process Clause of the Fifth Amendment furnishes a federal defendant with [a] guarantee against discriminatory federal prosecution." United States v. Steele, 461 F.2d 1148, 1151 (9th Cir. 1972) ("Steele"). In other words, "the decision to

prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[.]'" Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531 (1985) ("Wayte") (internal quotation marks omitted). Classifications based on the exercise of constitutionally protected rights constitute "arbitrary classifications" that may not be the basis for decisions to prosecute. See id.; Hartman v. Moore, 547 U.S. 250, 256, 126 S.Ct. 1695, 1701 (2006).

"The requirements for a selective-prosecution claim draw on ordinary equal protection standards." Armstrong, 517 U.S. at 465, 116 S.Ct. at 1487 (internal quotation marks omitted). The defendant "must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." Id. (internal quotation marks omitted). The standard for a selective prosecution claim is a "demanding one[,]" id. at 463, 116 S.Ct. at 1486, "requir[ing] a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." United States v. Sutcliffe, 505 F.3d 944, 954 (9th Cir. 2007) (quoting Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 489, 119 S.Ct. 936, 946 (1999)); see also Armstrong, 517 U.S. at 464, 116 S.Ct. at 1486 ("[I]n the absence of clear evidence to the contrary, courts presume that [the Attorney General and the United States Attorneys] have properly discharged their official duties.") (internal quotation marks omitted).

The same "justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim[,]" Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488, although the showing necessary for obtaining discovery is "somewhat less" than that required for dismissal. United States v. Arenas-Ortiz, 339 F.3d 1066, 1069 (9th Cir. 2003). To obtain discovery on a selective prosecution claim, the defendant must present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488 (internal quotation marks omitted); see United States v. Bourgeois, 964 F.2d 935, 939 (9th Cir. 1992) (defendant must "present specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of government actors").

**DISCUSSION**

Wilson argues that the government's decision to prosecute him "for federal arson is the result of an unconstitutional policy targeting persons the government believed to be anti-government protesters." (Dkt. 130, Motion at 1).  According to Wilson, the government relied on an "arbitrary classification," consisting of all "individuals associated with the protests who the government thought held anti-government views, regardless of what actual views they held." (Dkt. 153, Reply at 2-3); (see Dkt. 130, Motion at 18) ("[T]he only characteristic distinguishing Wilson from the thousands of arson cases in this District that are not charged federally is that he is believed to hold and espouse anti-government views.").

To evaluate whether there is "some evidence tending to show the existence of the essential elements of the defense," Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488 (internal quotation marks omitted), Wilson proposes a control group consisting of "all individuals whom the USAO could charge federally for arson either under § 844(f), as Wilson and Beasley were charged here, or § 844(i), as others involved in the protests were charged." (Dkt. 130, Motion at 12).  Wilson acknowledges that "his constitutional right to freedom of expression and association does not immunize him from prosecution for unlawful conduct." (Id. at 1).  However, he contends that he was "charged with a federal crime for his conduct while, for the last 20 years, other similarly situated individuals in the Central District were not federally prosecuted[.]" (See id. at 1-2).  In the alternative, Wilson argues that he "is entitled to discovery on his motion for selective prosecution." (Id. at 2).

A.      Discriminatory Effect.

As the Supreme Court noted in Armstrong, evidence that "similarly situated persons . . . were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court" would "tend[] to show the existence of the discriminatory effect element."  517 U.S. at 469-70, 116 S.Ct at 1488-89 (internal quotations marks omitted).  "The similarly situated group is the control group.  The control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment rights.  If all other things are equal, the prosecution of only those persons exercising their

constitutional rights gives rise to an inference of discrimination." United States v. Aguilar, 883 F.2d 662, 706 (9th Cir. 1989), superseded on other grounds by statute, as recognized in United States v. Gonzalez-Torres, 309 F.3d 594 (9th Cir. 2002).  In the selective prosecution context, statistical evidence may be used to analyze discriminatory effect.  United States v. Sellers, 906 F.3d 848, 853 (9th Cir. 2018).  "For instance, comparing who was arrested with who was prosecuted, or the demographics of those prosecuted in state and federal courts for the same crime, may evince differential treatment of similarly situated individuals."  Id.

1.    **Federal Prosecution of Arson Cases**.

Federal arson is punishable under two subsections of 18 U.S.C. § 844.[2]  Section 844(f) applies when arson has resulted in damage to "any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance[.]"[3]  Section 844(i) applies to the arson of "any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce[.]"

The USAO has brought a total of 15 cases alleging violations of either § 844(f) or § 844(i) in the past 20 years.  (See Dkt. 130-1, Motion, Exh. A, Criminal Cases Report for 18 U.S.C. § 844(f)); (id., Exh. B, Criminal Cases Report for 18 U.S.C. § 844(i)).  In the last ten years, the USAO filed six cases that included a federal arson charge.  (See Dkt. 130, Motion at 2-3); (Dkt. 130-1, Motion, Exh. A, Criminal Cases Report for 18 U.S.C. § 844(f)); (Id., Exh. B, Criminal Cases Report for 18 U.S.C. § 844(i)).  Of those six cases, four relate to activity that occurred during the George Floyd protests.[4]  (See Dkt. 130, Motion at 2-3).

_____

[2]  Unless otherwise indicated, all section references are to Title 18 of the United States Code.

[3]  As noted earlier, defendants in this case were charged with a violation of § 844(f).

[4]  See United States v. Tillmon, Case No. CR 20-0289 (C.D. Cal. June 25, 2020); United States v. Alvarado, Case No. CR 20-0331 (C.D. Cal. July 15, 2020);  United States v. Espriu, Case No. ED CR 20-0171 (C.D. Cal. Sept. 10, 2020); United States v. Wilson, Case No. CR 20-0516 (C.D. Cal. Oct. 9, 2020).

As to the two arson cases that did not involve conduct during the George Floyd protests – United States v. Beal and United States v. Wright – the defendants in those cases were plainly not similarly situated to Wilson or Beasley. (See Dkt. 130, Motion at 2-5). Beal and Wright each involved an arson charge in addition to other very serious federal charges. For example, in Beal, the defendant allegedly "used a Weapon o[f] Mass Destruction . . . to kill his ex-girlfriend, seriously wounding two other victims and obliterating a commercial office space in the process." United States v. Beal, Case No. SA CR 19-0047 (C.D. Cal. Aug. 31, 2020) (Dkt. 66, Government's Opposition to Defendant's Application for Reconsideration of Bond at 1). In Wright, the defendant, who was the mayor pro tem of Adelanto, was charged with bribery of programs receiving federal funds "in connection with the future expansions of a marijuana business zone, and . . . the curtailment of code enforcement." United States v. Wright, Case No. ED CR 17-0229 (C.D. Cal. Nov. 6, 2017), (Dkt. 11, Indictment at 1-3). Thus, Beal and Wright were charged with federal arson and attempted arson, respectively, in conjunction with other serious federal criminal charges of murder using a weapon of mass destruction, and bribery by a public official. By contrast, Wilson and Beasley were charged with stand-alone arson charges for conduct allegedly committed during the George Floyd protests. The instant case – along with Tillmon and Alvarado – constitutes one of the first stand-alone arson charges filed in this District in about 15 years.[5]

2.    **Arson Cases in the Central District of California**.

That the USAO filed no stand-alone arson cases for nearly 15 years is not due to a lack of arson in the Central District of California ("Central District"). The California Department of Justice reports that, for the seven counties that comprise the Central District, there were an average of 3,500 arsons reported each year, from 2010 through 2019. (See Dkt. 130-3, Motion, Exh. C, OpenJustice Crimes & Clearances 2010-2019); (Id., Exh. D, OpenJustice Crimes & Clearances

---

[5] The last stand-alone federal arson charge in the Central District appears to have been in 2007. (See United States v. Haag, Case No. CR 07-1010 (C.D. Cal. Sept. 21, 2007) (Dkt. 11, Indictment) (Dkt. 130-1, Motion, Exh. A, Criminal Cases Report for 18 U.S.C. § 844(f) at 1); (id., Exh. B, Criminal Cases Report for 18 U.S.C. § 844(i) at 1-2).

2010-2019). On average, 559 of these incidents resulted in arrests and prosecution each year during the same period. (See id.).

Federal law enforcement also tracks arsons through its Uniform Crime Report for "Offenses Known to Law Enforcement," which identified 329 arson offenses in the Central District in 2019. (See Dkt. 130-10, Motion, Exh. J, Table 10 Offenses Known to Law Enforcement 2019). The report also identified 344 arson offenses in 2018, 373 in 2017, and 342 in 2016, with the majority of these offenses occurring in Los Angeles County. (See Dkt. 130-11, Motion, Exh. K, Table 10: Offenses Known to Law Enforcement 2018); (Id., Exh. L, Table 10: Offenses Known to Law Enforcement 2017); (Id., Exh. M, Table 10: Offenses Known to Law Enforcement 2016).

Also, in Los Angeles – the headquarters of the USAO for the Central District – there were over 2,000 documented arson incidents between 2016 and 2020, including 666 in 2020 alone.[6] (See Dkt. 130-5, Motion, Exh. E, Los Angeles City Crime Data from 2020 to Present). In 2020, the Los Angeles District Attorney's Office filed 465 charges alleging felony arson under California Penal Code § 451. (See id., Exh. N, Declaration of Mohammed Al Rawi at ¶ 6).

3.    **Discussion**.

The government contends that Wilson's proposed control group is improper, and that the proper control group consists of the three other arson cases charged in this District for conduct that occurred during the George Floyd protests. (Dkt. 148, Opp. at 14). According to the government, this control group illustrates that "similarly-situated persons with no demonstrable 'anti-government' views could have been and were federally prosecuted." (Id.) (emphasis in original). The government's contentions are unpersuasive.

The purpose of the control group is to compare the moving defendant with a group of similarly situated individuals who were not part of the same "arbitrary classification" the defendant is challenging. See Aguilar, 883 F.2d at 706 ("The control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment

---

[6] In Santa Monica, there were 71 reported arsons in 2020. (See Dkt. 130-15, Motion, Exh. O, Santa Monica Open Data, Police Incidents).

rights. If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination."); see also Rosenbaum v. City and Cnty. of San Francisco, 484 F.3d 1142, 1153 (9th Cir. 2007) ("The first step in equal protection analysis is to identify the [government's] classification of groups. . . . Once the plaintiff establishes governmental classification, it is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared.") (internal quotation marks omitted) (ellipsis in original). As Wilson notes, the defendants in the government's proposed control group "cannot be the proper comparator group, because they all share the same characteristic of being targeted for imputed anti-government views. Instead, the proper comparator group must be all arsons that occurred in the district that could have been charged federally but were not." (Dkt. 153, Reply at 1); see Sellers, 906 F.3d at 853 ("For instance, comparing who was arrested with who was prosecuted, or the demographics of those prosecuted in state and federal courts for the same crime, may evince differential treatment of similarly situated individuals.").

The Ninth Circuit's decision in Steele is helpful in assessing the identification of the proper control group in this case. In Steele, the defendant and three other individuals were prosecuted after they refused to complete certain questions on the census. 461 F.2d at 1150. All four individuals had "participated in a census resistance movement, publicizing a dissident view of the census as an unconstitutional invasion of privacy and urging the public to avoid compliance with census requirements." Id. at 1150-51. Although the defendant was "hampered by the government's refusal to supply data on the number of like offenses," he "did manage to show that at least six others had committed the same offense." Id. at 1151. "None of those had taken a public stand against the census and none were recommended for prosecution." Id. Further, the six other individuals were known to the government because "the census operating procedures would in the normal course of events furnish information about any person who failed to complete the questionnaire[,]" and at least two officials would follow up with those persons. See id. at 1152.

In Steele, the comparator group was the six individuals who committed the same criminal conduct, i.e., failing to answer the census, but were not associated with a census resistance movement. See 461 F.2d at 1152. The Ninth Circuit found that, "[s]ince Steele had presented

evidence which created a strong inference of discriminatory prosecution, the government was required to explain it away, if possible, by showing the selection process actually rested upon some valid ground." Id. Because "no valid basis for the selection of defendants was ever presented," the Ninth Circuit reversed the conviction, finding that "Steele demonstrated a purposeful discrimination by census authorities against those who had publicly expressed their opinions about the census." Id.

As in Steele, Wilson proposes a control group that, as the government puts it, "isolate[s] the factor allegedly subject to impermissible discrimination." (See Dkt. 148, Opp. at 17 n. 5). As Wilson notes, "[t]he isolated factor that separates his prosecution from that of other arson cases in the district is that it arose from the protests and he was charged as a result of his perceived anti-government views." (Dkt. 153, Reply at 8); (see Dkt. 130, Motion at 18) ("[T]he only characteristic distinguishing Wilson from the thousands of arson cases in this District that are not charged federally is that he is believed to hold and espouse anti-government views.").

With respect to Wilson's proposed control group, the government raises various issues regarding the statistics put forth by defendant, stating, for example, that "[t]hey do not tell us whether any of those arson cases occurred in the midst of the 2020 protests." (Dkt. 148, Opp. at 15). According to the government, "[t]he statistics are silent on whether any of those arson cases began as federal investigations, as defendants' case did. The statistics say nothing about whether any of the cases were referred for federal prosecution but declined." (Id.). However, the government's issues with the statistics put forth by Wilson have nothing to do with the reliability of the statistics and, as the Supreme Court has stated, "[p]resumptions at war with presumably reliable statistics have no proper place in the analysis of this issue." Armstrong, 517 U.S. at 469-70, 116 S.Ct. at 1489.

Further, the government's concerns regarding Wilson's statistics simply underscore the need for Wilson to obtain the necessary discovery. In other words, some of the claimed deficiencies raised by the government go directly to whether or not selective prosecution occurred in this case. In short, the court is persuaded that the control group proposed by Wilson is proper because both its members and defendants "are the same in all relevant respects, except that" the

11

charged offense – arson – allegedly occurred during the George Floyd protests.[7]  See Aguilar, 883 F.2d at 706 (noting that "[i]f all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination").  As the Supreme Court noted in Armstrong, evidence that "similarly situated persons . . . were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court" would "tend[] to show the existence of the discriminatory effect element."  517 U.S. at 469-70, 116 S.Ct at 1488-89 (internal quotations marks omitted); see Sellers, 906 F.3d at 853 ("In the selective prosecution context, statistical evidence of differential treatment is ostensibly available.  For instance, comparing who was arrested with who was prosecuted, or the demographics of those prosecuted in state and federal courts for the same crime, may evince differential treatment of similarly situated individuals.") (internal citation omitted).

Putting aside, for now, the statements made by government officials, the USAO was no doubt aware of many of the arsons – some of which were very serious – that occurred in the Central District during the last 15 or so years.  In addition to the FBI report that identified 329 arsons in 2019 in the Central District, (see Dkt. 130-10, Motion, Exh. J, Table 10: Offenses Known to Law Enforcement 2019), the USAO was obviously aware of and chose not to federally prosecute far more serious and damaging arsons, including the arson of one of the country's most historic and significant religious buildings, and another that caused more than $5 million in damages.  (See, e.g., Jonah Valdez, "Arson Suspect Arrested in Separate Incident a Day After San Gabriel Mission Fire," San Gabriel Valley Tribune (July 22, 2020)); (Brian Rokos, "Convicted Arsonist Now Accused of Torching Orange County Business, Burglarizing Fire Stations," Orange County Register (Aug. 27, 2019)).  The government does not dispute that many of the arsons

---

[7] The government's reliance on United States v. Wood, 2021 WL 3048448 (D. Del. 2021), (see Dkt. 148, Opp. at 11), is unpersuasive.  There, the court emphasized that the plaintiff could not establish discriminatory intent for his selective prosecution claim because he relied on statements by former Attorney General Barr that were "made months after Defendant's alleged conduct and after the grand jury returned its indictment."  Wood, 2021 WL 3048448, at *3 (emphasis in original).  Here, Wilson points to statements by Barr and former President Trump that were contemporaneous with the incident, and thus were made months before the government formally charged defendant.  (See Dkt. 130, Motion at 15-19); (Dkt. 11, Indictment).

involving buildings (e.g., the San Gabriel Mission), businesses, and vehicles could have been federally prosecuted.[8] (See, generally, Dkt. 148, Opp.); see, e.g., United States v. Renteria, 557 F.3d 1003, 1010 (9th Cir. 2009) (holding that  trier of fact could have found a "synagogue was used for interstate or foreign commercial purposes in addition to religious purposes"); United States v. Garcia, 768 F.3d 822, 831 (9th Cir. 2014) (upholding "per se rule that damage to a rental apartment building satisfies the jurisdictional provisions of 18 U.S.C. § 844(i)"); United States v. Geiger, 263 F.3d 1034, 1037-38 (9th Cir. 2001) (holding that arson of a leased truck was properly prosecuted under 18 U.S.C. § 844(i) because "the fact that [the] truck was subject to a lease means that the truck was 'used in' an activity affecting interstate commerce").  Nor does the government dispute that no other stand-alone federal arson case – other than those that involved conduct during the George Floyd protests – has been brought in the Central District in nearly 15 years.  In short, the court finds that Wilson has put forth "some evidence tending to show the existence of the discriminatory effect element." Armstrong, 517 U.S. at 469, 116 S.Ct. at 1488 (internal quotation marks omitted).

      B.     Discriminatory Intent.

To prove discriminatory intent, a defendant must show that the government undertook a particular course of action, "at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." Wayte, 470 U.S. at 610, 105 S.Ct. at 1532 (internal quotation marks omitted). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564 (1977).

---

[8] The court deems the government's failure to respond or otherwise address arguments or points raised by Wilson in his moving papers as a concession or waiver of the argument or point. See, e.g., Garrett v. City of Los Angeles, 2014 WL 11397949, *11 (C.D. Cal. 2014) ("[P]laintiff did not respond to defendants' arguments in his Opposition [regarding his Monell claim].  Therefore, to the extent that plaintiff seeks to bring forth a claim under Monell, the court deems this argument abandoned[.]"); Ramirez v. Ghilotti Bros. Inc., 941 F.Supp.2d 1197, 1210 (N.D. Cal. 2013) ("[Defendant] has not responded at all to Plaintiffs' detailed breakdown of which affirmative defenses could be saved by amendment, conceding the issue."); In re Online DVD Rental Antitrust Litig., 2011 WL 5883772, *12 (N.D. Cal. 2011) (noting that normally, failure to respond to an argument on the merits is "viewed as grounds for waiver or concession of the argument").

Such evidence includes "a clear pattern" of discriminatory effect; "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up to the challenged decision"; and "[t]he legislative or administrative history[,] . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." See id. at 266-68, 97 S.Ct. at 564-65; see, e.g., Ave. 6E Invs., LLC v. City of Yuma, Ariz., 818 F.3d 493, 504 (9th Cir. 2016) (applying Arlington Heights and holding that "community members' opposition to Developers' application, using language indicating animus toward a protected class," including "code words" such as "concerns about . . . large families, unattended children, parking, and crime . . . may demonstrate discriminatory intent"); id. at 508 ("Developers allege specific facts demonstrating city officials' awareness that the effect of their denial of Developers' application would bear more heavily on one race than another in light of historical patterns of segregation by race and class") (footnote omitted).

Wilson contends that the government decided to prosecute him "because the alleged offense was associated with expressive conduct and the government believed he held and espoused anti-government views." (Dkt. 130, Motion at 19). The government responds that defendants "do not provide any support for their assertion that holding 'anti-government' views qualifies as an 'arbitrary classification' within the meaning of Oyler and its progeny[,]" and that, even if they had, "defendants have not provided any evidence to show that the decisionmakers in the defendants' case had any idea what opinions defendants held about the government, if any." (Dkt. 148, Opp. at 9). The government's assertions are unpersuasive.

As an initial matter, the evidence of discriminatory effect discussed above, see supra at § A., supports the discriminatory intent factor. See Vill. of Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 564 ("The impact of the official action whether it bears more heavily on one [group] than another, may provide an important starting point" in "[d]etermining whether invidious discriminatory purpose was a motivating factor[.]") (internal quotation marks omitted); Ave. 6E Invs., LLC, 818 F.3d at 504 (noting that "whether [the challenged decision] creates a disparate impact" is one way courts analyze discriminatory purpose); Pac. Shores Properties, LLC v. City of Newport Beach,

730 F.3d 1142, 1166 (9th Cir. 2013) (noting that statistical evidence can help prove both disparate impact and discriminatory intent) (collecting cases); Mendiola-Martinez v. Arpaio, 836 F.3d 1239, 1261 (9th Cir. 2016) ("In determining whether a discriminatory intent or purpose exists, [courts] may consider direct evidence of discrimination, statistical evidence showing a discriminatory impact, or other factors that could reveal a discriminatory purpose, like the historical background of the policy."); Tuitt, 68 F.Supp.2d at 10 (explaining that "[a] discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose" for purposes of an Armstrong evaluation).  Further, the public statements by the former President and former Attorney General, the Task Force Memorandum distributed to all the United States Attorney's Offices, and the conference call Barr held with the United States Attorney's Offices across the country support the notion that the decisionmakers may have identified, as "anti-government extremists," individuals accused of engaging in criminal activity during the George Floyd protests.   Under the circumstances, the court is persuaded that individuals associated with the protests who the government believed, or had reason to believe, held "anti-government" views, regardless of what views the individuals actually held, qualifies as an arbitrary classification within the meaning of Oyler and its progeny.  See Steele, 461 F.2d at 1152 ("An enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right."); United States v. Falk, 479 F.2d 616, 620 (7th Cir. 1973) ("discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government" is "forbidden by the Constitution"); Wayte, 470 U.S. at 608, 105 S.Ct. at 1531 ("the exercise of protected statutory and constitutional rights" is an "arbitrary classification," which, like race and religion, is an "unjustifiable standard" for prosecution) (internal quotation marks omitted).

As to whether the government knew or believed that defendants held anti-government views prior to the filing of the Indictment, (see Dkt. 148, Opp. at 9), the actual beliefs of the targeted individuals are not relevant to the inquiry, because under Wilson's theory, it is the government that developed and implemented the alleged "arbitrary classification."  (See Dkt. 130,

Motion at 18). In other words, it is the characterization of the targeted group, i.e., the George Floyd protesters, by the government that matters. Here, the Task Force Memorandum acknowledges that the "extremists profess a variety of ideologies" but "are united in their opposition to the core constitutional values of a democratic society governed by law." (Task Force Memorandum at 1). In addition, some of the government's exhibits include information indicating that the decisionmakers viewed Wilson and Beasley as anti-government extremists. (See, e.g., Dkt. 148-1, Declaration of Sara Milstein ("Milstein Decl."), Exh. 1, Incident Summary at 1) (stating that Beasley "escalat[ed] protest groups in Oakland, CA" and "travels throughout California to participate in protests and potentially escalate protesters with threats to law enforcement."); (id., Exh. 7, Irvine Police Department Investigation Supplemental at USAO_000165) (stating that, on May 31, 2020, Wilson "had gone to the protest to see what was going on."). In short, the evidence in the record is sufficient to constitute some evidence that defendants were targeted for federal prosecution, "at least in part because of" their anti-government views and association with the George Floyd protests. See Wayte, 470 U.S. at 610, 105 S.Ct. at 1532 (internal quotation marks omitted).

Next, the government contends that there is "no evidence that any discriminatory policy existed or that any such policy affected the charging decision in defendants' particular case." (Dkt. 148, Opp. at 4); (see id. at 10) ("But defendants have not shown that any 'top-down directive' was given, that any such directive was adopted in the Central District of California, that any directive was implemented, or that any directive impacted defendants' case."). Again, the government's contentions are unpersuasive.

In addition to the various statements noted below, there is evidence that the DOJ adopted a policy of targeting for federal prosecution those allegedly involved in criminal activity during the George Floyd protests. As noted earlier, the Task Force Memorandum, directed to "all heads of department components and United States Attorneys," stated that "anti-government extremists" were "engaged in indefensible acts of violence[,]" "[a]mid peaceful demonstrations protected by the First Amendment," and, in response, Barr created "a task force devoted to countering violent anti-government extremists" that would "help law enforcement at all levels identify, investigate, and

prosecute violent acts by anti-government extremists." (Task Force Memorandum at 1-2). Also, in his conference call with the United States Attorneys from across the country, Barr directed the implementation of a policy to "seek . . . federal charges" against demonstrators, "even when state charges could apply[.]"[9] (See Aruna Viswanatha & Sadie Gurman, "Barr Tells Prosecutors to Consider Charging Violent Protesters With Sedition," The Wall Street Journal (Sept. 17, 2020)). Under the circumstances, the conference call and the Task Force Memorandum constitute some, if not clear, evidence of a DOJ policy, including the USAO, aimed at prosecuting those engaged in criminal conduct during the George Floyd protests that were considered to hold "anti-government" views.

Although the existence of the explicit DOJ policy is sufficient to constitute some evidence of discriminatory intent, see Wayte, 470 U.S. at 608 n. 10, 105 S.Ct. at 1531 n. 10 ("A showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification."), there is also other evidence indicating that the government specifically targeted for federal prosecution those individuals associated with the George Floyd protests it believed held anti-government views. For example, during a call with state governors on June 1, 2020, the former President stated that "what went on in Los Angeles with the stores and the . . . is terrible. Total domination, you have to dominate. . . . You've got to arrest these people and you've got to judge them, and you can't do the deal where they get one week in jail. These are terrorists . . . they're looking to do bad things to our country. They're Antifa and they're radical left." ("President Trump's Call with US Governors Over Protests," CNN (June 1, 2020), https://bit.ly/Trump-call). The purpose of this crackdown, according to the former President, was

---

[9] The government asserts that because Wilson has not shown that members of the USAO were on the conference call, he has failed to provide evidence that this policy was adopted by the USAO in this District. (See Dkt. 148, Opp. at 9-11). But there is no evidence to indicate that the USAO of the Central District was carved out, or somehow opted out of, the Attorney General's mandate, and the government made no attempt to explain why the United States Attorney for the Central District, or one of his designees, would not join a call that involved all the Unites States Attorneys in the country. (See, generally, id.). In any event, this information is solely within the government's possession, and can be provided in response to Wilson's discovery requests. See Wayte, 470 U.S. at 624, 105 S.Ct. at 1539 (Marshall, J., dissenting) ("[M]ost of the relevant proof in selective prosecution cases will normally be in the Government's hands.").

"to do retribution . . . us[ing] []our own legal system." (Id.).  Also, during the call, Barr stated that in "most places, you have this ingredient of extremist anarchist agitators" and that, "if we treat these as demonstrations, the police are pinned back, . . . and don't have the dynamic ability to go out and arrest the troublemakers[.]"  (Id.).  These "contemporary statements[,]" especially those from the DOJ, provide "historical background" describing the "specific sequence of events" as well as an indication of the government actors' retaliatory thinking in seeking to use the legal system to charge individuals such as Wilson.  See Vill. of Arlington Heights, 429 U.S. at 266-68, 97 S.Ct. at 564-65 (noting that discriminatory intent may be evidenced by such factors as disproportionate impact, the historical background of the challenged decision, departures from normal procedures, and contemporary statements of the decisionmakers, in addition to the "specific sequence of events leading up to the challenged decision").

Finally, the government argues that there was no discriminatory intent in prosecuting defendants because "the facts of this case show that defendants' prosecution was based on probable cause and arose after considering defendants' conduct as well as their histories of violence and threats."  (Dkt. 148, Opp. at 1); (see id. at 12) ("the established record shows that defendants' prosecution was founded on probable cause and based on the particular facts of the case").  However, even if the government had probable cause to bring the charges against defendants, that does not immunize its charging decision where, as here, defendants provided some evidence of discriminatory effect and intent.[10]  See Wayte, 470 U.S. at 607-08, 105 S.Ct.

[10]  The government claims that defendants' prosecution began as an FBI investigation into threats Beasley made against law enforcement.  (See Dkt. 148, Opp. at 1-2 & 12).  During the investigation, the FBI came across a video appearing to show Beasley and Wilson committing the crime at issue.  (See id. at 2-3 & 12).  However, as Wilson states, "[i]f the government went on to charge Beasley with criminal threats, its argument would carry some persuasive weight.  In that scenario, it would mean the reasons for the government's investigation of Beasley led directly to a charge for the conduct that sparked the investigation.  Instead, the government chose not to file charges related to the threat to police and instead charged Beasley and Wilson with arson."  (Dkt. 153, Reply at 6). Thus, it appears that the reason(s) why the investigation was initiated has only minimal relevance to whether discriminatory intent formed at least some basis for the decision to prosecute defendants.  In any event, the USAO can, in response to Wilson's discovery requests, provide the information that supports the reason(s) the government claims it prosecuted defendants.

at 1530-31 (although the decision to prosecute "generally rests" in the prosecutor's discretion so long as probable cause exists, prosecutorial discretion is not "unfettered" and the "decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification") (internal citations and quotation marks omitted). In other words, defendants need not show that the decision to prosecute them rested solely on an impermissible motive. See id. at 610, 105 S.Ct. at 1532 (the "discriminatory purpose" requirement "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group") (quoting Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296 (1979)).

C.      Conclusion.

In short, the court is persuaded that Wilson has presented more than "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488 (internal quotation marks omitted); see Arenas-Ortiz, 339 F.3d at 1069 (describing the showing necessary for obtaining discovery as "somewhat less" than that required for dismissal). In other words, Wilson has "present[ed] specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of government actors." Bourgeois, 964 F.2d at 939.

Prior to conducting an evidentiary hearing to consider the evidence relating to defendants' selective prosecution claim, counsel for the parties shall meet and confer to discuss the government's sole objection to Wilson's discovery requests on the basis of the deliberative process privilege. "The burden is on the party asserting the privilege to establish all the elements of the privilege." United States v. Pac. Gas & Elec. Co., 2016 WL 3252779, *2 (N.D. Cal. 2016) (internal quotation marks omitted). Here, the government's assertion of the deliberative process privilege as to all requested discovery is overbroad. The government "must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." Id. (internal quotation marks omitted). In other words, "[b]ecause the deliberative process is so dependent upon the individual document and the role it plays in the administrative

process," id. (internal quotation marks omitted), the government must provide a detailed explanation as to which specific document is protected by the deliberative process privilege.

**CONCLUSION**

Based on the foregoing, IT IS ORDERED THAT:

1. Wilson's Motion **(Document No. 130)** is **granted in part** as set forth in this Order.  It is **denied without prejudice** in all other respects.

2. The government shall respond to Wilson's discovery requests no later than **August 26, 2022**.  For any document that is withheld and/or redacted on the basis of the deliberative process privilege,[11] the government shall provide a privilege log no later than ten (10) calendar days prior to the meet and confer referenced above.  To the extent possible, the privilege log shall comply with the format set forth in Form No. 11:A contained in the California Practice Guide: Federal Civil Procedure Before Trial (The Rutter Group 2022).  Any document that contains both protected and responsive information shall be redacted to eliminate only the information subject to the deliberative process privilege.  Finally, to the extent the USAO claims that all responsive information has been provided in response to any of Wilson's discovery requests, the USAO shall set forth in detail, in a declaration under penalty of perjury:  (i) the efforts the USAO and all of its staff made to obtain the requested information; and (ii) whether further responsive information exists or is available.

Dated this 12th day of August, 2022.

_____
/s/
Fernando M. Olguin
United States District Judge

---

[11]  The government's response to Wilson's discovery requests was not provided to the court, and there is no indication in the government's opposition to Wilson's motion to compel discovery that the government objected to Wilson's discovery requests on any ground other than the deliberative process privilege.  (See, generally, Dkt. 148, Opp. at 17-19).  Thus, unless the government raised other discovery objections to Wilson's discovery requests, it appears that the government has waived all objections to the discovery requests except for the deliberative process privilege.