Name  AUSA Jeremiah Levine

Address  312 N. Spring St.

City, State, Zip  Los Angeles, CA 90012

Phone  (213) 894-8323

Fax  (213) 894-0141

E-Mail  jeremiah.levine@usdoj.gov

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER: |
|---|---|
| PLAINTIFF(S), | 20-CR-00516-FMO |
| v. | |
| NATHAN WILSON, et al. | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

NOTICE IS HEREBY GIVEN that _____ United States of America _____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

~~**Civil Matter**~~

☒ Order (specify):
Order Denying Government's Motion; CR 240, Filed on 12/21/22;
Order Granting Defendant's Motion; CR 205, Filed on 8/12/22

☒ Judgment (specify):
 Indictment Dismissed; CR No. 241, Filed on 12/21/22

☐ Other (specify):

Imposed or Filed on  12/21/22, 8/12/22 .  Entered on the docket in this action on  12/21/22, 8/12/22 .

A copy of said judgment or order is attached hereto.

January 19, 2023                                s/ Jeremiah Levine
Date                                              Signature
                                                 ☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**  The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

JS-3

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| UNITED STATES OF AMERICA, | ) | Case No. CR 20-0516 FMO |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **JUDGMENT** |
| NATHAN WILSON et al., | ) | |
| Defendants. | ) | |

Pursuant to the Court's Order Re: Pending Motion, filed contemporaneously with the filing of this Judgment, IT IS ADJUDGED that the Indictment in the above-captioned action is dismissed without prejudice.

Dated this 21st day of December, 2022.

_____
/s/
Fernando M. Olguin
United States District Judge

JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,                ) Case No. CR 20-0516 FMO
                                         )
                 Plaintiff,              )
         v.                              )
                                         )
NATHAN WILSON et al.,                    ) **ORDER RE: PENDING MOTION**
                                         )
                 Defendants.             )
_____ )

Having reviewed and considered all the briefing filed with respect to the government's Motion for Reconsideration and Request for Stay of Court's Order of August 12, 2022 (Dkt. 207, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## BACKGROUND[1]

Following the death of George Floyd at the hands of police in May 2020, protests against racial injustice erupted across the country, including in Santa Monica, California. (See, e.g., Dkt. 205, Court's Order of August 12, 2022, at 1). On October 23, 2020, a federal grand jury returned

_____

[1] Because the parties are familiar with the facts and allegations, the court will repeat them below only as necessary.

1  a single-count Indictment against Nathan Wilson ("Wilson") and Christopher Beasley ("Beasley"

2  and together with Wilson, "defendants"), charging them with malicious damage to property owned

3  by an institution or organization receiving federal financial assistance, in violation of 18 U.S.C. §§

4  844(f)(1) and (2). (See Dkt. 11, Indictment).  According to the government, defendants destroyed

5  a vehicle belonging to the Santa Monica Police Department by lighting it on fire during the George

6  Floyd protests on or about May 31, 2020. (See Dkt. 205, Court's Order of August 12, 2022, at 1,

7  4, 8 & 11-12).

8       Wilson propounded discovery requests seeking, among other things, information about

9  cases the United States Attorney's Office for the Central District of California has brought charging

10 violations of 18 U.S.C. §§ 844(f) and (i); the criteria used to decide whether to file such charges;

11 communications about the decision to prosecute Wilson; and communications about the decision

12 to prosecute cases arising out of the George Floyd protests. (See Dkt. 130, Motion to Dismiss

13 or in the Alternative Compel Discovery ("Discovery Motion") at 19).  The government responded

14 by stating that it would not provide the requested discovery. (See id.).

15      Wilson then filed the Discovery Motion, in which Beasley joined, arguing that (1) the

16 Indictment should be dismissed because the government engaged in selective prosecution or, in

17 the alternative, (2) the government should be compelled to produce discovery relevant to

18 defendants' selective prosecution claim. (See Dkt. 130, Discovery Motion at 11-22).  According

19 to Wilson, the government's "decision to prosecute [him] for federal arson is the result of an

20 unconstitutional policy targeting persons the government believed to be anti-government

21 protesters." (Id. at 1).  The government opposed the Discovery Motion, arguing that defendants

22 had not identified a similarly situated control group for their selective prosecution claim, (see Dkt.

23 148, Government's Opposition to Defendants' Motion to Dismiss and Motion to Compel Discovery

24 ("Discovery Motion Opp."), at 13-17), and that they had failed to show the government acted with

25 a discriminatory purpose based upon an arbitrary classification. (See id. at 8-13).  The court

26 granted in part and denied in part the Discovery Motion. (See Dkt. 205, Court's Order of August

27 12, 2022, at 20).  Although the court declined to dismiss the Indictment, it ordered the government

28

1   to respond to Wilson's discovery requests and to provide a privilege log for any document that is

2   withheld and/or redacted on the basis of the deliberative process privilege.  (See id.).

3      Relying on Local Civil Rule 7-18,[2] the government filed the instant Motion, seeking

4   reconsideration of the Court's Order of August 12, 2022.  (See Dkt. 207, Motion).  The court set

5   a briefing schedule and stayed the government's compliance with the Court's Order of August 12,

6   2022, pending further order of the court.  (See Dkt. 208, Court's Order of August 29, 2022).

7   **DISCUSSION**

8      Although the Federal Rules of Criminal Procedure do not expressly authorize the filing of

9   motions for reconsideration, "numerous circuit courts have held that motions for reconsideration

10   may be filed in criminal cases."  United States v. Hector, 368 F.Supp.2d 1060, 1063 (C.D. Cal.

11   2005), rev'd on other grounds, 474 F.3d 1150 (9th Cir. 2007).  "Courts have held that motions for

12   reconsideration in criminal cases are governed by the rules that govern equivalent motions in civil

13   proceedings."  United States v. Mendez, 2008 WL 2561962, *2 (C.D. Cal. 2008).

14      "In this district, motions for reconsideration are governed by Local Rule 7-18," Milton H.

15   Greene Archives, Inc. v. CMG Worldwide, Inc., 568 F.Supp.2d 1152, 1162 (C.D. Cal. 2008), which

16   provides that such a motion

17       may be made only on the grounds of (a) a material difference in fact or law from

18       that presented to the Court that, in the exercise of reasonable diligence, could

19       not have been known to the party moving for reconsideration at the time the

20       Order was entered, or (b) the emergence of new material facts or a change of

21       law occurring after the Order was entered, or (c) a manifest showing of a failure

22       to consider material facts presented to the Court before the Order was entered.

23   Local Rule 7-18; see In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 966 F.Supp.2d 1031,

24   1036 (C.D. Cal. 2013) (same); Secs. & Exch. Comm'n v. Criterion Wealth Mgmt. Ins. Servs., Inc.,

25   2022 WL 3137444, *1 (C.D. Cal. 2022) (same).

26

27

28     [2] Local civil rules apply to criminal proceedings unless otherwise specified.  See Local Criminal Rule 57-1.

3

1    A "motion for reconsideration should not be granted[] absent highly unusual

2    circumstances[.]" Carroll v. Nakatani, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotation marks

3    omitted); see Kona Enters., Inc. v. Est. of Bishop, 229 F.3d 877, 890 (9th Cir. 2000)

4    (Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and

5    conservation of judicial resources.") (internal quotation marks omitted).  "Unhappiness with the

6    outcome is not included within the rule; unless the moving party shows that one of the stated

7    grounds for reconsideration exists, the Court will not grant a reconsideration." Roe v. LexisNexis

8    Risk Sols., Inc., 2013 WL 12134002, *2 (C.D. Cal. 2013).  "Whether to grant a motion for

9    reconsideration under Local Rule 7-18 is a matter within the court's discretion." Daghlian v. DeVry

10   Univ., Inc., 582 F.Supp.2d 1231, 1251 (C.D. Cal. 2007).

11   The Central District's Local Rule regarding motions for reconsideration admonishes parties

12   that "[n]o motion for reconsideration may in any manner repeat any oral or written argument made

13   in support of, or in opposition to, the original motion." Local Rule 7-18.  The government's Motion,

14   which draws on the same arguments it invoked in opposing the Discovery Motion, ignores this

15   admonition.  Specifically, the government presently argues that "[t]he members of defendants'

16   control group are not situated similarly to defendants." (Dkt. 207, Motion at 8).  The government

17   also argues that defendants' approach is flawed because "defendants suggest that the only

18   difference between the two groups is that the four federal cases occurred while those defendants

19   were engaged in Constitutionally protected activity." (Id. at 9) (emphasis omitted).  According to

20   the government, defendants "provided no other facts about the[] incidents" comprising the control

21   group. (Id.) (emphasis omitted).  The government similarly contends that the court misapplied the

22   burden for obtaining discovery in support of a selective-prosecution claim by "reliev[ing]

23   defendants of their burden to provide a control group of similarly situated individuals[.]" (Id. at 11).

24   The government's arguments, albeit improved and revamped, are the same ones it made

25   in its original opposition.  (Compare, e.g., Dkt. 148, Discovery Motion Opp. at 13) (referring to

26   defendants' "logically flawed argument . . . presenting two categories of arson cases"); (id. at 15)

27   (asserting that "Defendants' choice of control group is inapt" and that "[t]he proffered arson

28   statistics tell us nothing about whether the actual arson cases behind those statistics are 'similarly

1   situated' defendants' case"); (id. at 16) ("The arson statistics also tell us nothing about the

2   individuals involved in those other arson cases."); (id. at 17) ("Defendants have failed to prove that

3   they are similarly situated to the arsonists in their proposed control group.") with (Dkt. 207, Motion

4   at 8) ("The members of defendants' control group are not situated similarly to defendants."); (id.

5   at 9) (arguing that without "other facts about these [other arson] incidents[,] . . . there is no basis

6   on which to compare those cases against defendants' case, and no basis to believe those arson

7   defendants were 'similarly situated'"); (Dkt. 220, Reply in Support of Motion for Reconsideration

8   [] ("Reply") at 2) (arguing that "the members of defendants' control group were not similarly

9   situated to the defendants here").  But a motion for reconsideration is not another opportunity for

10  the losing party to make its strongest case, reassert arguments, or revamp arguments previously

11  found to be unpersuasive.  See Heathman v. Portfolio Recovery Assocs., LLC, 2013 WL

12  1284184, *1 (S.D. Cal. 2013) ("A motion to reconsider is not another opportunity for the losing

13  party to make its strongest case, reassert arguments, or revamp previously unmeritorious

14  arguments.") (internal quotation marks omitted).  Where a "motion for reconsideration raises no

15  new arguments, but instead relies on the same arguments made in the party's original opposition,

16  the motion for reconsideration should be denied." United States v. Goo, 2002 WL 1760850, *1

17  (D. Haw. 2002); see, e.g., Evans v. Woodford, 385 F.Appx. 655, 656 (9th Cir. 2010) (affirming

18  denial of motion for reconsideration where party "repeated the arguments raised in his oppositions

19  to the motion to dismiss"); Fuller v. M.G. Jewelry, 950 F.2d 1437, 1442 (9th Cir. 1991) ("[T]he trial

20  court did not abuse its discretion in denying the motion [for reconsideration], because the [moving

21  party] presented no arguments which the court had not already considered and rejected."); Above

22  the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983) ("[P]laintiff simply

23  reargued its previous argument.  Perhaps its new brief was better than its former brief but that is

24  not significant.").

25       The government also contends that "Defendants are [n]ot [m]embers of an [a]rbitrary

26  [c]lass[,]" and that the court erred by "presum[ing] that because defendants' conduct took place

27  during the George Floyd protests, defendants criminal conduct was protest-related and a

28  reflection of their anti-government views." (Dkt. 207, Motion at 12).  The government distinguishes

1   United States v. Steele, 461 F.2d 1148 (9th Cir. 1972), for the same reason.  (See id. at 12-13)

2   (arguing that "without the Steele defendants' vocal, anti-census expression, the Ninth Circuit

3   would not have been able to contrast their treatment against those other individuals who did not

4   comply with the census but did so silently" and that "defendants here did not evince any views at

5   all").  Again, the government made the same arguments in its original opposition.  (See, e.g., Dkt.

6   148, Discovery Motion Opp. at 9) (contending that "simply because the arson occurred during a

7   time of heightened civil unrest and protest does not prove that [defendants] held anti-government

8   views" and that "defendants do not show that they belong to the arbitrary classification[.]"); (id. at

9   17 n. 5) ("In Steele, the Ninth Circuit found that the defendant chose a proper control group that

10  isolated the factor allegedly subject to impermissible discrimination.").

11          Nor has the government pointed to "a material difference in [] law from that presented to

12  the Court that, in the exercise of reasonable diligence, could not have been known to [the

13  government] at the time the Order was entered, . . . or a change of law occurring after the Order

14  was entered[.]"  Local Rule 7-18.  For example, the government relied on United States v. Wood,

15  2021 WL 3048448 (D. Del. 2021), in its original opposition, (see Dkt. 148, Discovery Motion Opp.

16  at 11), for the same point it cites Wood in the instant Motion.  (See Dkt. 207, Motion at 17) (noting

17  that the Wood court stated it was "skeptical of the weight of any evidence that does not involve

18  the decisionmakers directly involved in the defendant's case"); (see also Dkt. 205, Court's Order

19  of August 12, 2022, at 12 n. 7) (distinguishing Wood).  The government also cites a few newer

20  out-of-circuit district court cases for the same general arguments it already presented.[3]  (See Dkt.

21  207, Motion at 16-17).  And the government belatedly distinguishes two cases that defendants

22  cited in their Discovery Motion, (see Dkt. 207, Motion at 18) (discussing United States v. Beal,

23  Case No. SA CR 19-0047 (C.D. Cal.), and United States v. Wright, Case No. ED CR 17-0229

24

25          [3]  The cases cited by the government were either available prior to the time when the
government filed its opposition to the Discovery Motion or prior to the issuance of the Court's

26  Order of August 12, 2022.  (See Dkt. 207, Motion at 16-17).  In other words, the government could
have cited these additional cases in its original opposition or in a notice of supplemental authority

27  prior to the order for which it seeks reconsideration.  Finally, the additional cases, all of which
were issued by other district courts, plainly do not reflect "a change of law occurring after the

28  Order was entered[.]"  Local Rule 7-18.

1   (C.D. Cal.)), even though the government had the opportunity to do so earlier.  (See Dkt. 130,

2   Discovery Motion at 2, 4-5, 13-15); (see also Dkt. 205, Court's Order of August 12, 2022, at 8);

3   Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co., 2015 WL 12732433, *34 (C.D. Cal. 2015) ("The court

4   is not obligated to give parties and their counsel several opportunities to raise facts and legal

5   arguments that could have been asserted earlier.  The papers filed with this court are not first

6   drafts, subject to revision and resubmission at the litigant's pleasure.").

7           In short, the government has not established any ground for the court to grant relief under

8   Local Rule 7-18.  Motions for reconsideration "are disfavored, and they should not be used to ask

9   the court to rethink what it has already thought through[,]" rightly or wrongly.  Arroyo v. Denaco,

10  LLC, 2020 WL 2477683, *1 (C.D. Cal. 2020); see Above the Belt, Inc., 99 F.R.D. at 101 ("Plaintiff

11  improperly used the motion to reconsider to ask the Court to rethink what the Court had already

12  thought through – rightly or wrongly."); Gray v. Golden Gate Nat. Recreational Area, 866

13  F.Supp.2d 1129, 1132 (N.D. Cal. 2011) (same).  Finally, the government has indicated that it does

14  not intend to comply with the Court's Order of August 12, 2022, and that it will instead seek

15  appellate review.  (See Dkt. 205, Motion at 20).  The court sees no point in going through the

16  process of holding the government in contempt in order to provide it with the basis for an

17  appealable order.[4]  Accordingly, the court will dismiss the Indictment without prejudice subject to

18  refiling, if appropriate, at a later time.

19          **This order is not intended for publication. Nor is it intended to be included in or**

20  **submitted to any online service such as Westlaw or Lexis.**

21                                          **CONCLUSION**

22          Based on the foregoing, IT IS ORDERED THAT:

23          1. The government's Motion (**Document No. 207**) is **denied**.  The Indictment is dismissed

24  without prejudice subject to refiling if the government decides to comply with the Court's Order of

25  August 12, 2022, or, alternatively, after all appeal proceedings are completed.

26  _____

27          [4]  The government takes a similar position.  (See Dkt. 220, Reply at 2) (stating that "[i]f the
    Court denies the government's motion for reconsideration, the appropriate remedy is dismissal
28  without prejudice so that the government may appeal.").

1     2.  Judgment shall be entered accordingly.

2 Dated this 21st day of December, 2022.

3

4                                                    /s/

5                                      Fernando M. Olguin
                                United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6                          **UNITED STATES DISTRICT COURT**
7                          **CENTRAL DISTRICT OF CALIFORNIA**
8
9    UNITED STATES OF AMERICA,          )         Case No. CR 20-0516 FMO
                                        )
10                  Plaintiff,          )
                                        )
11          v.                          )         **ORDER RE: PENDING MOTION**
                                        )
     NATHAN WILSON,                     )
12                                      )
                    Defendant.          )
13   _____   )

14          Having reviewed and considered all the briefing filed with respect to defendant Nathan

15   Wilson's ("Wilson") Motion to Dismiss or in the Alternative Compel Discovery (Dkt. 130, "Motion"),

16   the court finds that oral argument is not necessary to resolve the Motion, see Local Rule 7-15;

17   Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

18                                    **BACKGROUND**

19          In the summer of 2020, following the May 25, 2020, death of George Floyd at the hands

20   of police, widespread protests against racial injustice broke out across the country.  (See Irene

21   Oritseweyinmi Joe, "Probable Cause and Performing 'For The People,'" 70 Duke L. J. Online 138,

22   140-41 (May 2021)).  One such protest unfolded in the Los Angeles metropolitan area, specifically

23   Santa Monica, on May 31, 2020.  Former United States Attorney General William Barr ("Barr") and

24   former President Donald Trump ("Trump") made several public statements and issued various

25   directives about the protests – including those in Los Angeles – and how the United States

26   Department of Justice ("DOJ") intended to address criminal activity that occurred during the

27   protests.  For example, on May 30, 2020, Barr said in a "Statement on the Death of George Floyd

28   and Riots[,]" that the "protests [had been] hijacked by violent radical elements" and "[g]roups of

1    outside radicals and agitators are exploiting the situation to pursue their own separate and violent

2    agenda.  In many places, it appears the violence is planned, organized, and driven by anarchistic

3    and far left extremists, using Antifa-like tactics[.]"  (DOJ, "Attorney General William P. Barr's

4    Statement on the Death of George Floyd and Riots" (May 30, 2020), https://bit.ly/Barrstatement).[1]

5    Barr also stated that the "Department of Justice . . . and all of [its] 93 U.S. Attorneys across the

6    country, will support these local efforts and take all action necessary to enforce federal law."  (Id.).

7         The next day, the day of the protest at issue in this case, Barr issued a "Statement on Riots

8    and Domestic Terrorism," stating that "[f]ederal law enforcement actions will be directed at

9    apprehending and charging the violent radical agitators who have hijacked peaceful protest and

10   are engaged in violations of federal law. . . .  The violence instigated and carried out by Antifa and

11   other similar groups in connection with the rioting is domestic terrorism and will be treated

12   accordingly."  (DOJ, "Attorney General William P. Barr's Statement on Riots and Domestic

13   Terrorism" (May 31, 2020), https://bit.ly/Barr-on-terrorism).

14        In a Rose Garden speech on June 1, 2020, former President Trump said that "our nation

15   has been gripped by professional anarchists, violent mobs, arsonists, looters, criminals, rioters,

16   Antifa, and others. . . .  I want the organizers of this terror to be on notice that you will face severe

17   criminal penalties and lengthy sentences in jail.  This includes Antifa and others who are leading

18   instigators of this violence."  ("Trump to Mobilize Federal Resources to Stop Violence, Restore

19   Security," ABC News (June 1, 2020), https://bit.ly/Trump-Mobilizes).

20        The same day as the Rose Garden address, Trump and Barr held a conference call with

21   state governors in which Barr stated that in "most places, you have this ingredient of extremist

22

23   _____

24        [1]  The government does not raise any evidentiary objections to the public statements quoted
     in news articles and on government websites that defendant relies upon.  (See, generally, Dkt.
25   148, Government's Opposition to Defendants' Motion to Dismiss and Motion to Compel Discovery
     ("Opp.")); see Dutta v. State Farm Mut. Auto. Ins. Co., 895 F.3d 1166, 1172 (9th Cir. 2018) ("If a
26   party does not object to or challenge the improper submission of new evidence before the district
     court, the party who fails to object has waived any challenge on the admissibility of the evidence.")
27   (cleaned up); United States v. Tuitt, 68 F.Supp.2d 4, 7 (D. Mass. 1999) ("Because the substance
     of th[e] evidence [in support of defendant's motion for discovery] is not challenged by the
28   Government, although its import is, the court accepts the [] proffered evidence as accurate.").

1    anarchist agitators[,]" and that federal law enforcement would "go after the guys that are throwing
2    the bricks and (inaudible) . . . running around starting fires."  ("President Trump's Call with US
3    Governors Over Protests," <u>CNN</u> (June 1, 2020), https://bit.ly/Trump-call).  During the call, Trump
4    said that the federal government "will activate Bill Barr and activate him very strongly."  (<u>Id.</u>).  He
5    also referenced the May 31, 2020, Los Angeles protests, stating that "[o]f all the places, what went
6    on . . . in Los Angeles with the stores and the . . . is terrible.  Total domination, you have to
7    dominate. . . .  You've got to arrest these people and you've got to judge them, and you can't do
8    the deal where they get one week in jail.  These are terrorists[,] . . . they're looking to do bad
9    things to our country.  They're Antifa and they're radical left."  (<u>Id.</u>).

10           On June 26, 2020, nearly a month after the protest that is the subject of this case, Barr
11   issued a memorandum to all the United States Attorneys entitled, "Department of Justice Task
12   Force on Violent Anti-Government Extremists."  (<u>See</u> DOJ, "Memorandum Regarding Department
13   of Justice Task Force on Violent Anti-Government Extremists" (June 26, 2020),
14   https://bit.ly/Memo-task-force ("Task Force Memorandum")).  The Task Force Memorandum states
15   that the federal government had "evidence that anti-government violent extremists . . . will pose
16   continuing threats of lawlessness[,]" so Barr decided to create a "task force devoted to countering
17   violent anti-government extremists[,]" which would provide resources to help prosecute "violent
18   acts of anti-government extremists."  (<u>Id.</u> at 1-2).

19           In a television appearance on August 9, 2020, Barr said that Antifa is "a revolutionary group
20   that is interested in some form of socialism communism. . . .  They're essentially Bolsheviks, their
21   tactics are Fascist."  ("Bill Barr:  Antifa is 'New Form of Urban Guerrilla Warfare,'" <u>Fox News</u> (Aug.
22   9, 2020), https://bit.ly/Barr-on-Antifa).  According to Barr, "[i]t's a new form of urban guerrilla
23   warfare. . . . [W]hat they do is, they are essentially shielding themselves, or shrouding themselves
24   in First Amendment activity. . . .  [T]hey hijack these demonstrations and they provoke violence[.]"
25   (<u>Id.</u>).

26           In September, 2020, Barr held a conference call with the United States Attorneys from
27   across the country where he directed them to "be aggressive when charging violent demonstrators
28   with crimes" and "encouraged the prosecutors to seek a number [of] federal charges . . . even

3

1    when state charges could apply[.]"  (Aruna Viswanatha & Sadie Gurman, "Barr Tells Prosecutors

2    to Consider Charging Violent Protesters With Sedition," The Wall Street Journal (Sept. 17, 2020)).

3          On October 23, 2020, a federal grand jury returned a single-count indictment against

4    defendants charging them with malicious damage to property owned by an institution or

5    organization receiving federal financial assistance, in violation of 18 U.S.C. §§ 844(f)(1) and (2).

6    (See Dkt. 11, Indictment).  The Indictment alleges that, on or about May 31, 2020, defendants

7    destroyed a vehicle belonging to the Santa Monica Police Department by lighting it on fire.  (See

8    id.).

9          On May 14, 2021, Wilson propounded discovery requests seeking, among other things,

10   information about cases the United States Attorney's Office for the Central District of California

11   ("USAO") has brought charging violations of 18 U.S.C. §§ 844(f) and (i); the criteria used to decide

12   whether to file such charges; communications about the decision to prosecute Wilson; and

13   communications about the decision to prosecute cases arising out of the George Floyd protests.

14   (See Dkt. 130, Motion at 19).  The government responded on June 25, 2021, stating that it would

15   not provide the requested discovery.  (See Dkt. 130, Motion at 19).

16         Wilson filed the instant Motion, in which co-defendant Christopher Beasley ("Beasley")

17   joined, arguing that (1) the Indictment should be dismissed because the government engaged in

18   selective prosecution or, (2) in the alternative, the government should be compelled to produce

19   discovery relevant to defendants' selective prosecution claim.  (See Dkt. 130, Motion at 11-22).

20                                    **LEGAL STANDARD**

21         "A selective-prosecution claim is not a defense on the merits to the criminal charge itself,

22   but an independent assertion that the prosecutor has brought the charge for reasons forbidden

23   by the Constitution."  United States v. Armstrong, 517 U.S. 456, 463, 116 S. Ct. 1480, 1486 (1996)

24   ("Armstrong").  "[A]n indictment that results from selective prosecution will be dismissed."  United

25   States v. Mayer, 503 F.3d 740, 747 (9th Cir. 2007).  While "[m]ere selectivity in prosecution

26   creates no constitutional problem[,]" the "Due Process Clause of the Fifth Amendment furnishes

27   a federal defendant with [a] guarantee against discriminatory federal prosecution."  United States

28   v. Steele, 461 F.2d 1148, 1151 (9th Cir. 1972) ("Steele").  In other words, "the decision to

1  prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion,

2  or other arbitrary classification[.]'" Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524,

3  1531 (1985) ("Wayte") (internal quotation marks omitted). Classifications based on the exercise

4  of constitutionally protected rights constitute "arbitrary classifications" that may not be the basis

5  for decisions to prosecute. See id.; Hartman v. Moore, 547 U.S. 250, 256, 126 S.Ct. 1695, 1701

6  (2006).

7       "The requirements for a selective-prosecution claim draw on ordinary equal protection

8  standards." Armstrong, 517 U.S. at 465, 116 S.Ct. at 1487 (internal quotation marks omitted).

9  The defendant "must demonstrate that the federal prosecutorial policy had a discriminatory effect

10  and that it was motivated by a discriminatory purpose." Id. (internal quotation marks omitted). The

11  standard for a selective prosecution claim is a "demanding one[,]" id. at 463, 116 S.Ct. at 1486,

12  "requir[ing] a criminal defendant to introduce 'clear evidence' displacing the presumption that a

13  prosecutor has acted lawfully." United States v. Sutcliffe, 505 F.3d 944, 954 (9th Cir. 2007)

14  (quoting Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 489, 119 S.Ct. 936,

15  946 (1999)); see also Armstrong, 517 U.S. at 464, 116 S.Ct. at 1486 ("[I]n the absence of clear

16  evidence to the contrary, courts presume that [the Attorney General and the United States

17  Attorneys] have properly discharged their official duties.") (internal quotation marks omitted).

18       The same "justifications for a rigorous standard for the elements of a selective-prosecution

19  claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim[,]"

20  Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488, although the showing necessary for obtaining

21  discovery is "somewhat less" than that required for dismissal. United States v. Arenas-Ortiz, 339

22  F.3d 1066, 1069 (9th Cir. 2003). To obtain discovery on a selective prosecution claim, the

23  defendant must present "some evidence tending to show the existence of the essential elements

24  of the defense, discriminatory effect and discriminatory intent." Armstrong, 517 U.S. at 468, 116

25  S.Ct. at 1488 (internal quotation marks omitted); see United States v. Bourgeois, 964 F.2d 935,

26  939 (9th Cir. 1992) (defendant must "present specific facts, not mere allegations, which establish

27  a colorable basis for the existence of both discriminatory application of a law and discriminatory

28  intent on the part of government actors").

**DISCUSSION**

Wilson argues that the government's decision to prosecute him "for federal arson is the result of an unconstitutional policy targeting persons the government believed to be anti-government protesters." (Dkt. 130, Motion at 1). According to Wilson, the government relied on an "arbitrary classification," consisting of all "individuals associated with the protests who the government thought held anti-government views, regardless of what actual views they held." (Dkt. 153, Reply at 2-3); (see Dkt. 130, Motion at 18) ("[T]he only characteristic distinguishing Wilson from the thousands of arson cases in this District that are not charged federally is that he is believed to hold and espouse anti-government views.").

To evaluate whether there is "some evidence tending to show the existence of the essential elements of the defense," Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488 (internal quotation marks omitted), Wilson proposes a control group consisting of "all individuals whom the USAO could charge federally for arson either under § 844(f), as Wilson and Beasley were charged here, or § 844(i), as others involved in the protests were charged." (Dkt. 130, Motion at 12). Wilson acknowledges that "his constitutional right to freedom of expression and association does not immunize him from prosecution for unlawful conduct." (Id. at 1). However, he contends that he was "charged with a federal crime for his conduct while, for the last 20 years, other similarly situated individuals in the Central District were not federally prosecuted[.]" (See id. at 1-2). In the alternative, Wilson argues that he "is entitled to discovery on his motion for selective prosecution." (Id. at 2).

A. Discriminatory Effect.

As the Supreme Court noted in Armstrong, evidence that "similarly situated persons . . . were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court" would "tend[] to show the existence of the discriminatory effect element." 517 U.S. at 469-70, 116 S.Ct at 1488-89 (internal quotations marks omitted). "The similarly situated group is the control group. The control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment rights. If all other things are equal, the prosecution of only those persons exercising their

1  constitutional rights gives rise to an inference of discrimination." United States v. Aguilar, 883 F.2d

2  662, 706 (9th Cir. 1989), superseded on other grounds by statute, as recognized in United States

3  v. Gonzalez-Torres, 309 F.3d 594 (9th Cir. 2002).  In the selective prosecution context, statistical

4  evidence may be used to analyze discriminatory effect.  United States v. Sellers, 906 F.3d 848,

5  853 (9th Cir. 2018).  "For instance, comparing who was arrested with who was prosecuted, or the

6  demographics of those prosecuted in state and federal courts for the same crime, may evince

7  differential treatment of similarly situated individuals."  Id.

8            1.    **Federal Prosecution of Arson Cases**.

9        Federal arson is punishable under two subsections of 18 U.S.C. § 844.[2]  Section 844(f)

10  applies when arson has resulted in damage to "any building, vehicle, or other personal or real

11  property in whole or in part owned or possessed by, or leased to, the United States, or any

12  department or agency thereof, or any institution or organization receiving Federal financial

13  assistance[.]"[3]  Section 844(i) applies to the arson of "any building, vehicle, or other real or

14  personal property used in interstate or foreign commerce or in any activity affecting interstate or

15  foreign commerce[.]"

16        The USAO has brought a total of 15 cases alleging violations of either § 844(f) or § 844(i)

17  in the past 20 years.  (See Dkt. 130-1, Motion, Exh. A, Criminal Cases Report for 18 U.S.C. §

18  844(f)); (id., Exh. B, Criminal Cases Report for 18 U.S.C. § 844(i)).  In the last ten years, the

19  USAO filed six cases that included a federal arson charge.  (See Dkt. 130, Motion at 2-3); (Dkt.

20  130-1, Motion, Exh. A, Criminal Cases Report for 18 U.S.C. § 844(f)); (Id., Exh. B, Criminal Cases

21  Report for 18 U.S.C. § 844(i)).  Of those six cases, four relate to activity that occurred during the

22  George Floyd protests.[4]  (See Dkt. 130, Motion at 2-3).

23

---

24        [2]  Unless otherwise indicated, all section references are to Title 18 of the United States Code.

25        [3]  As noted earlier, defendants in this case were charged with a violation of § 844(f).

26        [4]  See United States v. Tillmon, Case No. CR 20-0289 (C.D. Cal. June 25, 2020); United States

27  v. Alvarado, Case No. CR 20-0331 (C.D. Cal. July 15, 2020);  United States v. Espriu, Case No.
ED CR 20-0171 (C.D. Cal. Sept. 10, 2020); United States v. Wilson, Case No. CR 20-0516 (C.D.

28  Cal. Oct. 9, 2020).

1        As to the two arson cases that did not involve conduct during the George Floyd protests

2  – United States v. Beal and United States v. Wright – the defendants in those cases were plainly

3  not similarly situated to Wilson or Beasley.  (See Dkt. 130, Motion at 2-5).  Beal and Wright each

4  involved an arson charge in addition to other very serious federal charges.  For example, in Beal,

5  the defendant allegedly "used a Weapon o[f] Mass Destruction . . . to kill his ex-girlfriend, seriously

6  wounding two other victims and obliterating a commercial office space in the process."  United

7  States v. Beal, Case No. SA CR 19-0047 (C.D. Cal. Aug. 31, 2020) (Dkt. 66, Government's

8  Opposition to Defendant's Application for Reconsideration of Bond at 1).  In Wright, the defendant,

9  who was the mayor pro tem of Adelanto, was charged with bribery of programs receiving federal

10  funds "in connection with the future expansions of a marijuana business zone, and . . . the

11  curtailment of code enforcement."  United States v. Wright, Case No. ED CR 17-0229 (C.D. Cal.

12  Nov. 6, 2017), (Dkt. 11, Indictment at 1-3).  Thus, Beal and Wright were charged with federal

13  arson and attempted arson, respectively, in conjunction with other serious federal criminal charges

14  of murder using a weapon of mass destruction, and bribery by a public official.  By contrast, Wilson

15  and Beasley were charged with stand-alone arson charges for conduct allegedly committed during

16  the George Floyd protests.  The instant case – along with Tillmon and Alvarado – constitutes one

17  of the first stand-alone arson charges filed in this District in about 15 years.[5]

18        **2.**    **Arson Cases in the Central District of California**.

19        That the USAO filed no stand-alone arson cases for nearly 15 years is not due to a lack of

20  arson in the Central District of California ("Central District").  The California Department of Justice

21  reports that, for the seven counties that comprise the Central District, there were an average of

22  3,500 arsons reported each year, from 2010 through 2019.  (See Dkt. 130-3, Motion, Exh. C,

23  OpenJustice Crimes & Clearances 2010-2019); (Id., Exh. D, OpenJustice Crimes & Clearances

24

25

26      _____

27      [5]  The last stand-alone federal arson charge in the Central District appears to have been in 2007.  (See United States v. Haag, Case No. CR 07-1010 (C.D. Cal. Sept. 21, 2007) (Dkt. 11,

28  Indictment) (Dkt. 130-1, Motion, Exh. A, Criminal Cases Report for 18 U.S.C. § 844(f) at 1); (id., Exh. B, Criminal Cases Report for 18 U.S.C. § 844(i) at 1-2).

1   2010-2019).  On average, 559 of these incidents resulted in arrests and prosecution each year

2   during the same period.  (See id.).

3      Federal law enforcement also tracks arsons through its Uniform Crime Report for "Offenses

4   Known to Law Enforcement," which identified 329 arson offenses in the Central District in 2019.

5   (See Dkt. 130-10, Motion, Exh. J, Table 10 Offenses Known to Law Enforcement 2019).  The

6   report also identified 344 arson offenses in 2018, 373 in 2017, and 342 in 2016, with the majority

7   of these offenses occurring in Los Angeles County.  (See Dkt. 130-11, Motion, Exh. K, Table 10:

8   Offenses Known to Law Enforcement 2018); (Id., Exh. L, Table 10: Offenses Known to Law

9   Enforcement 2017); (Id., Exh. M, Table 10: Offenses Known to Law Enforcement 2016).

10     Also, in Los Angeles – the headquarters of the USAO for the Central District – there were

11  over 2,000 documented arson incidents between 2016 and 2020, including 666 in 2020 alone.[6]

12  (See Dkt. 130-5, Motion, Exh. E, Los Angeles City Crime Data from 2020 to Present).  In 2020,

13  the Los Angeles District Attorney's Office filed 465 charges alleging felony arson under California

14  Penal Code § 451.  (See id., Exh. N, Declaration of Mohammed Al Rawi at ¶ 6).

15      3. **Discussion**.

16     The government contends that Wilson's proposed control group is improper, and that the

17  proper control group consists of the three other arson cases charged in this District for conduct

18  that occurred during the George Floyd protests.  (Dkt. 148, Opp. at 14).  According to the

19  government, this control group illustrates that "similarly-situated persons with no demonstrable

20  'anti-government' views could have been and were federally prosecuted."  (Id.) (emphasis in

21  original).  The government's contentions are unpersuasive.

22     The purpose of the control group is to compare the moving defendant with a group of

23  similarly situated individuals who were not part of the same "arbitrary classification" the defendant

24  is challenging.  See Aguilar, 883 F.2d at 706 ("The control group and defendant are the same in

25  all relevant respects, except that defendant was, for instance, exercising his first amendment

26

27     [6]  In Santa Monica, there were 71 reported arsons in 2020.  (See Dkt. 130-15, Motion, Exh. O,

28  Santa Monica Open Data, Police Incidents).

1   rights.  If all other things are equal, the prosecution of only those persons exercising their

2   constitutional rights gives rise to an inference of discrimination."); see also Rosenbaum v. City and

3   Cnty. of San Francisco, 484 F.3d 1142, 1153 (9th Cir. 2007) ("The first step in equal protection

4   analysis is to identify the [government's] classification of groups. . . .  Once the plaintiff establishes

5   governmental classification, it is necessary to identify a 'similarly situated' class against which the

6   plaintiff's class can be compared.") (internal quotation marks omitted) (ellipsis in original).  As

7   Wilson notes, the defendants in the government's proposed control group "cannot be the proper

8   comparator group, because they all share the same characteristic of being targeted for imputed

9   anti-government views.  Instead, the proper comparator group must be all arsons that occurred

10  in the district that could have been charged federally but were not."  (Dkt. 153, Reply at 1); see

11  Sellers, 906 F.3d at 853 ("For instance, comparing who was arrested with who was prosecuted,

12  or the demographics of those prosecuted in state and federal courts for the same crime, may

13  evince differential treatment of similarly situated individuals.").

14        The Ninth Circuit's decision in Steele is helpful in assessing the identification of the proper

15  control group in this case.  In Steele, the defendant and three other individuals were prosecuted

16  after they refused to complete certain questions on the census.  461 F.2d at 1150.  All four

17  individuals had "participated in a census resistance movement, publicizing a dissident view of the

18  census as an unconstitutional invasion of privacy and urging the public to avoid compliance with

19  census requirements."  Id. at 1150-51.  Although the defendant was "hampered by the

20  government's refusal to supply data on the number of like offenses," he "did manage to show that

21  at least six others had committed the same offense."  Id. at 1151.  "None of those had taken a

22  public stand against the census and none were recommended for prosecution."  Id.  Further, the

23  six other individuals were known to the government because "the census operating procedures

24  would in the normal course of events furnish information about any person who failed to complete

25  the questionnaire[,]" and at least two officials would follow up with those persons.  See id. at 1152.

26        In Steele, the comparator group was the six individuals who committed the same criminal

27  conduct, i.e., failing to answer the census, but were not associated with a census resistance

28  movement.  See 461 F.2d at 1152.  The Ninth Circuit found that, "[s]ince Steele had presented

1    evidence which created a strong inference of discriminatory prosecution, the government was

2    required to explain it away, if possible, by showing the selection process actually rested upon

3    some valid ground." Id. Because "no valid basis for the selection of defendants was ever

4    presented," the Ninth Circuit reversed the conviction, finding that "Steele demonstrated a

5    purposeful discrimination by census authorities against those who had publicly expressed their

6    opinions about the census." Id.

7        As in Steele, Wilson proposes a control group that, as the government puts it, "isolate[s]

8    the factor allegedly subject to impermissible discrimination." (See Dkt. 148, Opp. at 17 n. 5).  As

9    Wilson notes, "[t]he isolated factor that separates his prosecution from that of other arson cases

10   in the district is that it arose from the protests and he was charged as a result of his perceived anti-

11   government views." (Dkt. 153, Reply at 8); (see Dkt. 130, Motion at 18) ("[T]he only characteristic

12   distinguishing Wilson from the thousands of arson cases in this District that are not charged

13   federally is that he is believed to hold and espouse anti-government views.").

14       With respect to Wilson's proposed control group, the government raises various issues

15   regarding the statistics put forth by defendant, stating, for example, that "[t]hey do not tell us

16   whether any of those arson cases occurred in the midst of the 2020 protests."  (Dkt. 148, Opp.

17   at 15).  According to the government, "[t]he statistics are silent on whether any of those arson

18   cases began as federal investigations, as defendants' case did.  The statistics say nothing about

19   whether any of the cases were referred for federal prosecution but declined." (Id.).  However, the

20   government's issues with the statistics put forth by Wilson have nothing to do with the reliability

21   of the statistics and, as the Supreme Court has stated, "[p]resumptions at war with presumably

22   reliable statistics have no proper place in the analysis of this issue." Armstrong, 517 U.S. at 469-

23   70, 116 S.Ct. at 1489.

24       Further, the government's concerns regarding Wilson's statistics simply underscore the

25   need for Wilson to obtain the necessary discovery.  In other words, some of the claimed

26   deficiencies raised by the government go directly to whether or not selective prosecution occurred

27   in this case.  In short, the court is persuaded that the control group proposed by Wilson is proper

28   because both its members and defendants "are the same in all relevant respects, except that" the

1   charged offense – arson – allegedly occurred during the George Floyd protests.[7]  See Aguilar, 883

2   F.2d at 706 (noting that "[i]f all other things are equal, the prosecution of only those persons

3   exercising their constitutional rights gives rise to an inference of discrimination").  As the Supreme

4   Court noted in Armstrong, evidence that "similarly situated persons . . . were prosecuted by the

5   State of California and were known to federal law enforcement officers, but were not prosecuted

6   in federal court" would "tend[] to show the existence of the discriminatory effect element."  517

7   U.S. at 469-70, 116 S.Ct at 1488-89 (internal quotations marks omitted); see Sellers, 906 F.3d at

8   853 ("In the selective prosecution context, statistical evidence of differential treatment is ostensibly

9   available.   For instance, comparing who was arrested with who was prosecuted, or the

10   demographics of those prosecuted in state and federal courts for the same crime, may evince

11   differential treatment of similarly situated individuals.") (internal citation omitted).

12       Putting aside, for now, the statements made by government officials, the USAO was no

13   doubt aware of many of the arsons – some of which were very serious – that occurred in the

14   Central District during the last 15 or so years.  In addition to the FBI report that identified 329

15   arsons in 2019 in the Central District, (see Dkt. 130-10, Motion, Exh. J, Table 10: Offenses Known

16   to Law Enforcement 2019), the USAO was obviously aware of and chose not to federally

17   prosecute far more serious and damaging arsons, including the arson of one of the country's most

18   historic and significant religious buildings, and another that caused more than $5 million in

19   damages.  (See, e.g., Jonah Valdez, "Arson Suspect Arrested in Separate Incident a Day After

20   San Gabriel Mission Fire," San Gabriel Valley Tribune (July 22, 2020)); (Brian Rokos, "Convicted

21   Arsonist Now Accused of Torching Orange County Business, Burglarizing Fire Stations," Orange

22   County Register (Aug. 27, 2019)).  The government does not dispute that many of the arsons

23

24       [7]  The government's reliance on United States v. Wood, 2021 WL 3048448 (D. Del. 2021), (see
25   Dkt. 148, Opp. at 11), is unpersuasive.  There, the court emphasized that the plaintiff could not
     establish discriminatory intent for his selective prosecution claim because he relied on statements
26   by former Attorney General Barr that were "made months after Defendant's alleged conduct and
     after the grand jury returned its indictment."  Wood, 2021 WL 3048448, at *3 (emphasis in
27   original).  Here, Wilson points to statements by Barr and former President Trump that were
     contemporaneous with the incident, and thus were made months before the government formally
28   charged defendant.  (See Dkt. 130, Motion at 15-19); (Dkt. 11, Indictment).

1   involving buildings (e.g., the San Gabriel Mission), businesses, and vehicles could have been

2   federally prosecuted.[8]  (See, generally, Dkt. 148, Opp.); see, e.g., United States v. Renteria, 557

3   F.3d 1003, 1010 (9th Cir. 2009) (holding that  trier of fact could have found a "synagogue was

4   used for interstate or foreign commercial purposes in addition to religious purposes"); United

5   States v. Garcia, 768 F.3d 822, 831 (9th Cir. 2014) (upholding "per se rule that damage to a rental

6   apartment building satisfies the jurisdictional provisions of 18 U.S.C. § 844(i)"); United States v.

7   Geiger, 263 F.3d 1034, 1037-38 (9th Cir. 2001) (holding that arson of a leased truck was properly

8   prosecuted under 18 U.S.C. § 844(i) because "the fact that [the] truck was subject to a lease

9   means that the truck was 'used in' an activity affecting interstate commerce").  Nor does the

10  government dispute that no other stand-alone federal arson case – other than those that involved

11  conduct during the George Floyd protests – has been brought in the Central District in nearly 15

12  years.  In short, the court finds that Wilson has put forth "some evidence tending to show the

13  existence of the discriminatory effect element."  Armstrong, 517 U.S. at 469, 116 S.Ct. at 1488

14  (internal quotation marks omitted).

15          B.    Discriminatory Intent.

16          To prove discriminatory intent, a defendant must show that the government undertook a

17  particular course of action, "at least in part because of, not merely in spite of, its adverse effects

18  upon an identifiable group." Wayte, 470 U.S. at 610, 105 S.Ct. at 1532 (internal quotation marks

19  omitted). "Determining whether invidious discriminatory purpose was a motivating factor demands

20  a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Vill.

21  of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564 (1977).

22  _____

23          [8]  The court deems the government's failure to respond or otherwise address arguments or
    points raised by Wilson in his moving papers as a concession or waiver of the argument or point.
24  See, e.g., Garrett v. City of Los Angeles, 2014 WL 11397949, *11 (C.D. Cal. 2014) ("[P]laintiff did
    not respond to defendants' arguments in his Opposition [regarding his Monell claim].  Therefore,
25  to the extent that plaintiff seeks to bring forth a claim under Monell, the court deems this argument
    abandoned[.]"); Ramirez v. Ghilotti Bros. Inc., 941 F.Supp.2d 1197, 1210 (N.D. Cal. 2013)
26  ("[Defendant] has not responded at all to Plaintiffs' detailed breakdown of which affirmative
    defenses could be saved by amendment, conceding the issue."); In re Online DVD Rental Antitrust
27  Litig., 2011 WL 5883772, *12 (N.D. Cal. 2011) (noting that normally, failure to respond to an
    argument on the merits is "viewed as grounds for waiver or concession of the argument").
28

1    Such evidence includes "a clear pattern" of discriminatory effect; "[t]he historical background of

2    the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes";

3    "[t]he specific sequence of events leading up to the challenged decision"; and "[t]he legislative or

4    administrative history[,] . . . especially where there are contemporary statements by members of

5    the decisionmaking body, minutes of its meetings, or reports." See id. at 266-68, 97 S.Ct. at 564-

6    65; see, e.g., Ave. 6E Invs., LLC v. City of Yuma, Ariz., 818 F.3d 493, 504 (9th Cir. 2016)

7    (applying Arlington Heights and holding that "community members' opposition to Developers'

8    application, using language indicating animus toward a protected class," including "code words"

9    such as "concerns about . . . large families, unattended children, parking, and crime . . . may

10   demonstrate discriminatory intent"); id. at 508 ("Developers allege specific facts demonstrating city

11   officials' awareness that the effect of their denial of Developers' application would bear more

12   heavily on one race than another in light of historical patterns of segregation by race and class")

13   (footnote omitted).

14          Wilson contends that the government decided to prosecute him "because the alleged

15   offense was associated with expressive conduct and the government believed he held and

16   espoused anti-government views." (Dkt. 130, Motion at 19). The government responds that

17   defendants "do not provide any support for their assertion that holding 'anti-government' views

18   qualifies as an 'arbitrary classification' within the meaning of Oyler and its progeny[,]" and that,

19   even if they had, "defendants have not provided any evidence to show that the decisionmakers

20   in the defendants' case had any idea what opinions defendants held about the government, if any."

21   (Dkt. 148, Opp. at 9). The government's assertions are unpersuasive.

22          As an initial matter, the evidence of discriminatory effect discussed above, see supra at §

23   A., supports the discriminatory intent factor. See Vill. of Arlington Heights, 429 U.S. at 266, 97

24   S.Ct. at 564 ("The impact of the official action whether it bears more heavily on one [group] than

25   another, may provide an important starting point" in "[d]etermining whether invidious discriminatory

26   purpose was a motivating factor[.]") (internal quotation marks omitted); Ave. 6E Invs., LLC, 818

27   F.3d at 504 (noting that "whether [the challenged decision] creates a disparate impact" is one way

28   courts analyze discriminatory purpose); Pac. Shores Properties, LLC v. City of Newport Beach,

1    730 F.3d 1142, 1166 (9th Cir. 2013) (noting that statistical evidence can help prove both disparate

2    impact and discriminatory intent) (collecting cases); Mendiola-Martinez v. Arpaio, 836 F.3d 1239,

3    1261 (9th Cir. 2016) ("In determining whether a discriminatory intent or purpose exists, [courts]

4    may consider direct evidence of discrimination, statistical evidence showing a discriminatory

5    impact, or other factors that could reveal a discriminatory purpose, like the historical background

6    of the policy."); Tuitt, 68 F.Supp.2d at 10 (explaining that "[a] discriminatory effect which is severe

7    enough can provide sufficient evidence of discriminatory purpose" for purposes of an Armstrong

8    evaluation).  Further, the public statements by the former President and former Attorney General,

9    the Task Force Memorandum distributed to all the United States Attorney's Offices, and the

10   conference call Barr held with the United States Attorney's Offices across the country support the

11   notion that the decisionmakers may have identified, as "anti-government extremists," individuals

12   accused of engaging in criminal activity during the George Floyd protests.    Under the

13   circumstances, the court is persuaded that individuals associated with the protests who the

14   government believed, or had reason to believe, held "anti-government" views, regardless of what

15   views the individuals actually held, qualifies as an arbitrary classification within the meaning of

16   Oyler and its progeny.  See Steele, 461 F.2d at 1152 ("An enforcement procedure that focuses

17   upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen

18   for prosecution are being punished for their expression of ideas, a constitutionally protected

19   right."); United States v. Falk, 479 F.2d 616, 620 (7th Cir. 1973) ("discrimination on the basis of

20   the exercise of protected First Amendment activities, whether done as an individual or, as in this

21   case, as a member of a group unpopular with the government" is "forbidden by the Constitution");

22   Wayte, 470 U.S. at 608, 105 S.Ct. at 1531 ("the exercise of protected statutory and constitutional

23   rights" is an "arbitrary classification," which, like race and religion, is an "unjustifiable standard" for

24   prosecution) (internal quotation marks omitted).

25        As to whether the government knew or believed that defendants held anti-government

26   views prior to the filing of the Indictment, (see Dkt. 148, Opp. at 9), the actual beliefs of the

27   targeted individuals are not relevant to the inquiry, because under Wilson's theory, it is the

28   government that developed and implemented the alleged "arbitrary classification."  (See Dkt. 130,

Motion at 18).  In other words, it is the characterization of the targeted group, i.e., the George Floyd protesters, by the government that matters.  Here, the Task Force Memorandum acknowledges that the "extremists profess a variety of ideologies" but "are united in their opposition to the core constitutional values of a democratic society governed by law." (Task Force Memorandum at 1).  In addition, some of the government's exhibits include information indicating that the decisionmakers viewed Wilson and Beasley as anti-government extremists.  (See, e.g., Dkt. 148-1, Declaration of Sara Milstein ("Milstein Decl."), Exh. 1, Incident Summary at 1) (stating that Beasley "escalat[ed] protest groups in Oakland, CA" and "travels throughout California to participate in protests and potentially escalate protesters with threats to law enforcement."); (id., Exh. 7, Irvine Police Department Investigation Supplemental at USAO_000165) (stating that, on May 31, 2020, Wilson "had gone to the protest to see what was going on.").  In short, the evidence in the record is sufficient to constitute some evidence that defendants were targeted for federal prosecution, "at least in part because of" their anti-government views and association with the George Floyd protests.  See Wayte, 470 U.S. at 610, 105 S.Ct. at 1532 (internal quotation marks omitted).

Next, the government contends that there is "no evidence that any discriminatory policy existed or that any such policy affected the charging decision in defendants' particular case." (Dkt. 148, Opp. at 4); (see id. at 10) ("But defendants have not shown that any 'top-down directive' was given, that any such directive was adopted in the Central District of California, that any directive was implemented, or that any directive impacted defendants' case.").  Again, the government's contentions are unpersuasive.

In addition to the various statements noted below, there is evidence that the DOJ adopted a policy of targeting for federal prosecution those allegedly involved in criminal activity during the George Floyd protests.  As noted earlier, the Task Force Memorandum, directed to "all heads of department components and United States Attorneys," stated that "anti-government extremists" were "engaged in indefensible acts of violence[,]" "[a]mid peaceful demonstrations protected by the First Amendment," and, in response, Barr created "a task force devoted to countering violent anti-government extremists" that would "help law enforcement at all levels identify, investigate, and

prosecute violent acts by anti-government extremists." (Task Force Memorandum at 1-2). Also, in his conference call with the United States Attorneys from across the country, Barr directed the implementation of a policy to "seek . . . federal charges" against demonstrators, "even when state charges could apply[.]"[9] (See Aruna Viswanatha & Sadie Gurman, "Barr Tells Prosecutors to Consider Charging Violent Protesters With Sedition," The Wall Street Journal (Sept. 17, 2020)). Under the circumstances, the conference call and the Task Force Memorandum constitute some, if not clear, evidence of a DOJ policy, including the USAO, aimed at prosecuting those engaged in criminal conduct during the George Floyd protests that were considered to hold "anti-government" views.

Although the existence of the explicit DOJ policy is sufficient to constitute some evidence of discriminatory intent, see Wayte, 470 U.S. at 608 n. 10, 105 S.Ct. at 1531 n. 10 ("A showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification."), there is also other evidence indicating that the government specifically targeted for federal prosecution those individuals associated with the George Floyd protests it believed held anti-government views. For example, during a call with state governors on June 1, 2020, the former President stated that "what went on in Los Angeles with the stores and the . . . is terrible. Total domination, you have to dominate. . . . You've got to arrest these people and you've got to judge them, and you can't do the deal where they get one week in jail. These are terrorists . . . they're looking to do bad things to our country. They're Antifa and they're radical left." ("President Trump's Call with US Governors Over Protests," CNN (June 1, 2020), https://bit.ly/Trump-call). The purpose of this crackdown, according to the former President, was

_____

[9] The government asserts that because Wilson has not shown that members of the USAO were on the conference call, he has failed to provide evidence that this policy was adopted by the USAO in this District. (See Dkt. 148, Opp. at 9-11.) But there is no evidence to indicate that the USAO of the Central District was carved out, or somehow opted out of, the Attorney General's mandate, and the government made no attempt to explain why the United States Attorney for the Central District, or one of his designees, would not join a call that involved all the Unites States Attorneys in the country. (See, generally, id.). In any event, this information is solely within the government's possession, and can be provided in response to Wilson's discovery requests. See Wayte, 470 U.S. at 624, 105 S.Ct. at 1539 (Marshall, J., dissenting) ("[M]ost of the relevant proof in selective prosecution cases will normally be in the Government's hands.").

1   "to do retribution . . . us[ing] []our own legal system." (Id.). Also, during the call, Barr stated that

2   in "most places, you have this ingredient of extremist anarchist agitators" and that, "if we treat

3   these as demonstrations, the police are pinned back, . . . and don't have the dynamic ability to go

4   out and arrest the troublemakers[.]" (Id.). These "contemporary statements[,]" especially those

5   from the DOJ, provide "historical background" describing the "specific sequence of events" as well

6   as an indication of the government actors' retaliatory thinking in seeking to use the legal system

7   to charge individuals such as Wilson. See Vill. of Arlington Heights, 429 U.S. at 266-68, 97 S.Ct.

8   at 564-65 (noting that discriminatory intent may be evidenced by such factors as disproportionate

9   impact, the historical background of the challenged decision, departures from normal procedures,

10  and contemporary statements of the decisionmakers, in addition to the "specific sequence of

11  events leading up to the challenged decision").

12      Finally, the government argues that there was no discriminatory intent in prosecuting

13  defendants because "the facts of this case show that defendants' prosecution was based on

14  probable cause and arose after considering defendants' conduct as well as their histories of

15  violence and threats." (Dkt. 148, Opp. at 1); (see id. at 12) ("the established record shows that

16  defendants' prosecution was founded on probable cause and based on the particular facts of the

17  case").   However, even if the government had probable cause to bring the charges against

18  defendants, that does not immunize its charging decision where, as here, defendants provided

19  some evidence of discriminatory effect and intent.[10] See Wayte, 470 U.S. at 607-08, 105 S.Ct.

20

21      [10]  The government claims that defendants' prosecution began as an FBI investigation into

22  threats Beasley made against law enforcement. (See Dkt. 148, Opp. at 1-2 & 12).  During the
    investigation, the FBI came across a video appearing to show Beasley and Wilson committing the

23  crime at issue. (See id. at 2-3 & 12).  However, as Wilson states, "[i]f the government went on to
    charge Beasley with criminal threats, its argument would carry some persuasive weight.  In that

24  scenario, it would mean the reasons for the government's investigation of Beasley led directly to
    a charge for the conduct that sparked the investigation.  Instead, the government chose not to file

25  charges related to the threat to police and instead charged Beasley and Wilson with arson." (Dkt.
    153, Reply at 6). Thus, it appears that the reason(s) why the investigation was initiated has only

26  minimal relevance to whether discriminatory intent formed at least some basis for the decision to
    prosecute defendants.  In any event, the USAO can, in response to Wilson's discovery requests,

27  provide the information that supports the reason(s) the government claims it prosecuted

28  defendants.

18

1   at 1530-31 (although the decision to prosecute "generally rests" in the prosecutor's discretion so

2   long as probable cause exists, prosecutorial discretion is not "unfettered" and the "decision to

3   prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or

4   other arbitrary classification") (internal citations and quotation marks omitted).  In other words,

5   defendants need not show that the decision to prosecute them rested solely on an impermissible

6   motive.  See id. at 610, 105 S.Ct. at 1532 (the "discriminatory purpose" requirement "implies that

7   the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because

8   of,' not merely 'in spite of,' its adverse effects upon an identifiable group") (quoting Pers. Adm'r

9   of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296 (1979)).

10            C.      Conclusion.

11            In short, the court is persuaded that Wilson has presented more than "some evidence

12   tending to show the existence of the essential elements of the defense, discriminatory effect and

13   discriminatory intent."  Armstrong, 517 U.S. at 468, 116 S.Ct. at 1488 (internal quotation marks

14   omitted); see Arenas-Ortiz, 339 F.3d at 1069 (describing the showing necessary for obtaining

15   discovery as "somewhat less" than that required for dismissal). In other words, Wilson has

16   "present[ed] specific facts, not mere allegations, which establish a colorable basis for the existence

17   of both discriminatory application of a law and discriminatory intent on the part of government

18   actors."  Bourgeois, 964 F.2d at 939.

19            Prior to conducting an evidentiary hearing to consider the evidence relating to defendants'

20   selective prosecution claim, counsel for the parties shall meet and confer to discuss the

21   government's sole objection to Wilson's discovery requests on the basis of the deliberative

22   process privilege.  "The burden is on the party asserting the privilege to establish all the elements

23   of the privilege."  United States v. Pac. Gas & Elec. Co., 2016 WL 3252779, *2 (N.D. Cal. 2016)

24   (internal quotation marks omitted).  Here, the government's assertion of the deliberative process

25   privilege as to all requested discovery is overbroad.  The government "must establish what

26   deliberative process is involved, and the role played by the documents in issue in the course of

27   that process."  Id. (internal quotation marks omitted).  In other words, "[b]ecause the deliberative

28   process is so dependent upon the individual document and the role it plays in the administrative

1  process," id. (internal quotation marks omitted), the government must provide a detailed

2  explanation as to which specific document is protected by the deliberative process privilege.

3  **CONCLUSION**

4       Based on the foregoing, IT IS ORDERED THAT:

5       1.  Wilson's Motion **(Document No. 130)** is **granted in part** as set forth in this Order.  It is

6  **denied without prejudice** in all other respects.

7       2.  The government shall respond to Wilson's discovery requests no later than **August 26,**

8  **2022**.  For any document that is withheld and/or redacted on the basis of the deliberative process

9  privilege,[11] the government shall provide a privilege log no later than ten (10) calendar days prior

10  to the meet and confer referenced above.  To the extent possible, the privilege log shall comply

11  with the format set forth in Form No. 11:A contained in the California Practice Guide: Federal Civil

12  Procedure Before Trial (The Rutter Group 2022).  Any document that contains both protected and

13  responsive information shall be redacted to eliminate only the information subject to the

14  deliberative process privilege.  Finally, to the extent the USAO claims that all responsive

15  information has been provided in response to any of Wilson's discovery requests, the USAO shall

16  set forth in detail, in a declaration under penalty of perjury:  (i) the efforts the USAO and all of its

17  staff made to obtain the requested information; and (ii) whether further responsive information

18  exists or is available.

19  Dated this 12th day of August, 2022.

20

21                                                    /s/

22                                          Fernando M. Olguin
                                          United States District Judge

23

24  _____

25  [11]  The government's response to Wilson's discovery requests was not provided to the court, and there is no indication in the government's opposition to Wilson's motion to compel discovery

26  that the government objected to Wilson's discovery requests on any ground other than the deliberative process privilege.  (See, generally, Dkt. 148, Opp. at 17-19).  Thus, unless the

27  government raised other discovery objections to Wilson's discovery requests, it appears that the government has waived all objections to the discovery requests except for the deliberative process

28  privilege.